**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **QUINTEZ TALLEY** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **R. DOYLE, CYNTHIA LINK, LAURA** | : | |
| **BANTA, GENA CLARK, PA. DEPT. OF** | : | |
| **CORRECTIONS, GEORGE ONDREJKA,** | : | |
| **CAPTAIN MASCELLINO, JOHN** | : | |
| **WETZEL, LT. KOVIYAK and UNKNOWN** | : | |
| **EXTRACTION TEAM, MHM** | : | **NO. 19-1588** |

<u>**MEMORANDUM OPINION**</u>

**Savage, J.**                                                                                    **June 30, 2020**

Plaintiff Quintez Talley, a prisoner proceeding *pro se* and *in forma pauperis*, has sued the Pennsylvania Department of Corrections (DOC), Secretary John Wetzel, former Superintendent Cynthia Link, Deputy Superintendent Laura Banta, Corrections Evaluation Supervisor George Ondrejka, Major Gina Clark, Captain David Mascellino, Lieutenant David Jankoviak and the Unknown Extraction Team.[1]  He alleges that, in violation of his First Amendment Rights, they placed him in restraints whenever he claimed he was suicidal in retaliation for his having filed prior civil suits against the DOC and prison personnel.[2]

---

[1] Compl. (ECF No. 2).  Talley does not state most of the defendants' titles, and he misspells Clark's first and Jankoviak's last names.  The defendants supplied the correct titles and spellings.  Talley originally brought Americans with Disabilities Act, Rehabilitation Act, and Eighth and Fourteenth Amendment claims against the defendants and others.  *Id.* ¶¶ 21-25.  After considering the defendants' motions to dismiss and Talley's response, we dismissed those claims on November 14, 2019.  Nov. 14, 2019 Memo. (ECF No. 30).

[2] Compl. ¶¶ 12, 14.  Talley had filed ten civil actions in this district against DOC personnel and others working at DOC prisons prior to the events described in his complaint.

The defendants have moved for summary judgment, arguing that there is no evidence of a causal link between Talley's prior suits and his placement in restraints.[3] They point out that even though Talley repeatedly claimed he was suicidal and exhibited purportedly suicidal behavior, he was placed in restraints only after he had to be extracted from his cell.[4]

At Talley's request, we extended the deadline to respond to the motion for summary judgment to March 27, 2020.[5] Despite the extension and after an additional two months, Talley filed no response. Instead, on May 29, 2020, he filed a motion to strike the summary judgment motion without addressing the defendants' arguments nor contradicting or rebutting their statement of undisputed facts.[6] Instead, he recites the summary judgment standard.

The undisputed facts show that Talley was not placed in restraints because he claimed he was suicidal or had filed lawsuits against the DOC and its employees. Therefore, we shall grant the motion for summary judgment.

## Background

On January 6, 2018, while an inmate at the State Correctional Institute at Graterford, Talley was placed in a Psychiatric Observation Cell (POC) "after having attempted suicide by way of fire."[7] Within the POC, Talley remained on "close 1-on-1

---

[3] Defs.' Memo. in Supp. of Mot. for Summ. J. at 3 (ECF No. 42).

[4] *Id.* at 5-6.

[5] Pl.'s Mot. for Ext. of Time (ECF No. 43); Mar. 4, 2020 Order (ECF No. 44).

[6] Pl.'s Mot. to Strike Def.'s Mot. for Summ. J. (ECF No. 57).

[7] Compl. ¶ 8; Defs.' Stmt. of Undisputed Facts (DSUF) ¶ 4 (ECF No. 42-1). A POC is "[a] cell located in the infirmary area of the facility that is used to hold inmates who are mentally decompensating to the point where they are considered a danger to themselves, other inmates, and/or property. These cells

suicide watch."[8]   On January 9, after he was told he was being discharged from the POC, Talley told Registered Nurse Stephanie O'Neal that he was suicidal.[9]   After she informed a psychiatrist, Talley was recommitted to the POC.[10]

On that same day, at 9:16 a.m., Psychological Services Specialist Robert Ladonne evaluated Talley in the POC.[11]   Talley again indicated he was suicidal.[12]   Ladonne determined that Talley should remain in the POC and be evaluated for discharge later in the week.[13]   At 1:56 p.m., Doyle also evaluated Talley in the POC.[14]   He concluded that the "POC [was] not the appropriate environment" for Talley and discharged him.[15]   However, at 3:06 p.m., Doyle recommitted Talley to the POC after staff reported that he attempted to start another fire.[16]   Doyle noted that Talley's problems were "behavioral rather than psychiatric" and that Talley "did not require . . . restraints."[17]   Talley does not claim that he was placed in restraints at this time.[18]

---

provide a means of re[s]training (sic) the inmate, if necessary, and allow for constant supervision of the inmate to be maintained in order to treat the inmate."  DC-ADM 13.8.01.

[8] Compl. ¶ 10.

[9] *Id.*  Neither Talley's Complaint nor the DSUF specify the name of the individual who told him he was being discharged from the POC.

[10] *Id.*

[11] Defs.' Mot. for Summ. J. Ex. 2 at 2 (ECF No. 42-4).

[12] *Id.*

[13] *Id.*

[14] *Id.* Ex. 2 at 3-4.

[15] *Id.* Ex. 2 at 3.

[16] *Id.* Ex. 2 at 5.

[17] *Id.*

[18] *See generally* Compl.

The following morning, Ladonne again evaluated Talley in the POC.[19]  Talley told Ladonne he was suicidal.[20]  Ladonne noted that Talley was "very comfortable" and "eating, sleeping and talking when he wants to without showing any signs of dysfunction."[21]  He also concluded that Talley's problems were "behaviorally driven and not a byproduct of mental health issues."[22]

Talley was discharged from the POC, but refused to leave.[23]  After negotiations between Talley and the Hostage Negotiation Team failed, a Cell Extraction Team was assembled at approximately 7:15 p.m.[24]  Talley was removed from the POC, placed in an anti-suicide smock and intermediate restraint system, and evaluated by a nurse.[25]  Shortly after midnight, he was evaluated by Dr. Karudi, who opined that Talley "appear[ed] to harbor suicidal thoughts" and was "at risk for self harm" and recommitted him to the POC.[26]  At 7:55 a.m., on January 11, Ladonne reevaluated Talley, who told him that he was suicidal and would "continue to try to hurt himself."[27]  Talley claimed that he would attempt to kill himself by fire.[28]  Ladonne also noted that Talley had tried to hang himself

---

[19] *Id.* ¶ 11; Defs.' Mot. for Summ. J. Ex. 2 at 6.

[20] Compl. ¶ 11.

[21] Defs. Mot. for Summ. J. Ex. 2 at 6-7.

[22] *Id.*

[23] *Id.* Ex. 3 at 2 (ECF No. 42-5).

[24] *Id.*

[25] *Id.* at 2-3.

[26] *Id.* Ex. 2 at 8.

[27] *Id.* at 10, 12.

[28] *Id.*

with his restraints.[29]    However, Ladonne concluded that "it remains the view of the treatment team that Mr. Talley's actions and presentation are behaviorally driven and that he does not suffer from serious mental illness . . . ."[30]   That evening, Talley's restraints were removed.[31]

**Standard of Review**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).   Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   In examining the motion, we must draw all reasonable inferences in the nonmovant's favor.  *Young v. Martin*, 801 F.3d 172, 177 (3d Cir. 2015).

Talley did not file a substantive response to the motion.  He did not dispute the defendants' statement of the facts or present a counterstatement of facts.   Instead, reciting the standard of review of summary judgment, he filed a motion to strike the defendants' motion.

When the non-movant does not respond to a motion for summary judgment or present contravening facts, we still must conduct an independent analysis to determine whether the movant is entitled to summary judgment.  *See* FED. R. CIV. P. 56(e)(3) advisory     committee's     note     to     2010     amendment     (recognizing     that

---

[29] *Id.* at 12.

[30] *Id.*

[31] *Id.* Ex. 3 at 3.

"summary judgment cannot be granted by default even if there is a complete failure to respond to the motion"); E.D. Pa. LOCAL R. CIV. P. 7.1(c).  The court must ensure that "the motion and supporting materials . . . show that the movant is entitled to it."  FED. R. CIV. P. 56(e)(3).  In short, even in the absence of opposition, summary judgment may be granted only if the moving party demonstrates that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.

By failing to file a response, "the nonmoving party waives the right to respond to or to controvert the facts asserted in the summary judgment motion."  *Reynolds v. Rick's Mushroom Serv.*, 246 F. Supp. 2d 449, 453 (E.D. Pa. 2003) (quoting *Reed v. Nellcor Puritan Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002) and *Anchorage Assocs. v. V.I. Bd. of Tax Review*, 922 F.2d 168, 175–76 (3d Cir. 1990)).  The scheduling order clearly warned the parties that "[a]ll material facts set forth in the Statement of Undisputed Facts served by the movant shall be deemed undisputed unless specifically controverted by the opposing party."[32]  Talley did not challenge the defendants' Statement of Undisputed Facts.  Thus, our task is to determine whether, given these undisputed facts, the defendants are entitled to judgment as a matter of law.

## Analysis

To prevail on his First Amendment retaliation claim, Talley must prove that: (1) the conduct that instigated the retaliatory action was constitutionally protected; (2) he suffered an adverse action as a result of the prison official's retaliatory acts; and (3) there was a causal link between the exercise of his constitutional right and the adverse action, that is, his constitutionally protected conduct was a substantial or motivating factor in the state

---

[32] Scheduling Order ¶ 6(c) (ECF No. 67).

actor's decision to take the adverse action.  *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017).  For purposes of this motion, the defendants do not dispute that Talley's prior lawsuits were constitutionally protected and that placing him in restraints for 24 hours could be considered an adverse action.[33]  What they dispute is a causal link between his lawsuits and his placement in restraints.[34]  They emphasize that Talley has not produced any evidence of a link.

Talley alleges that Doyle told him on January 10 that because he had filed civil suits against prison personnel, he would be denied mental health treatment and placed in restraints "anytime in which [he] stated [he] was suicidal . . . ."[35]  A review of the record shows that Doyle did not meet with Talley on January 10.[36]  In his deposition, Talley could not provide any details about the alleged conversation.[37]  Nonetheless, even accepting Talley's unsupported allegation, there is no evidence that he was denied access to mental health providers and placed in restraints whenever he claimed he was suicidal.

On January 6, after Talley attempted suicide, he was not placed in restraints.[38]  Rather, he was placed on one-on-one suicide watch in the POC.[39]  When Talley was discharged on January 9, he told O'Neal he was still suicidal.[40]  Again, he was not placed

---

[33] Defs.' Memo. in Supp. of Mot. for Summ. J. at 3.

[34] *Id.*

[35] Compl. ¶¶ 12, 14.

[36] Defs.' Mot. for Summ. J. Ex. 2 at 5.

[37] *Id.* Ex. 1 at 16:23-18:13, 19:1-7 (ECF No. 42-3).

[38] Compl. ¶ 8; DSUF ¶ 4.

[39] Compl. ¶ 10.

[40] *Id.*

in restraints after stating that he was suicidal.[41]   Instead, O'Neal notified a psychiatrist, who recommitted him to the POC without restraints.[42]

On the morning of January 9, Talley told Ladonne that he was suicidal.[43]  Ladonne did not have Talley placed in restraints.[44]  He determined that Talley should remain in the POC without restraints.[45]   That afternoon, Doyle discharged Talley from the POC.[46] Within an hour, after Talley set another fire, Doyle recommitted him to the POC.[47]  Doyle specifically noted that Talley "did not require . . . restraints."[48]

Talley was placed in a modified anti-suicide smock and an Intermediate Restraint System only after he refused to leave his cell and had to be removed by an extraction team.[49]  The Intermediate Restraint System restricted Talley's movement via a waist belt with tethers between his wrists.[50]  Karudi evaluated Talley after the extraction and noted that he "appear[ed] to harbor suicidal thoughts."[51]   Karudi did not have Talley placed in restraints.  He was already in restraints.[52]  The following morning, Talley told Ladonne

---

[41] *See id.*

[42] *Id.*

[43] Defs.' Mot. for Summ. J. Ex. 2 at 2.

[44] *Id.*

[45] *Id.*

[46] *Id.* Ex. 2 at 2-3.

[47] *Id.* Ex. 2 at 5.

[48] *Id.*

[49] *Id.* Ex. 3 at 2.

[50] *Id.* Ex. 3 at 2, Ex. 4 (ECF No. 42-6).

[51] *Id.* Ex. 2 at 8.

[52] *Id.* Ex. 3 at 2.

that he was suicidal and would try to harm himself again.[53]   Ladonne also noted that Talley had tried to hang himself with his restraints.[54]   Ladonne concluded that Talley's actions were "behaviorally driven" rather than the result of "serious mental illness."[55] Talley's restraints were removed that evening.[56]

There is no evidence, direct or indirect, that Talley was placed in restraints for filing lawsuits against prison personnel or for claiming he was suicidal.   On the contrary, he repeatedly told prison personnel he was suicidal and exhibited suicidal behavior, but was not placed in restraints.   He was only put in restraints after he refused to leave the POC. Moreover, the restraints were removed 24 hours later after Ladonne determined that Talley's problems were behavioral rather than the result of mental illness.

DOC policy permits the use of restraints "when an inmate is acting in a manner as to be a clear and present danger to himself, to other inmates, or employees . . . ."[57]   They may be used "to control acute, or episodic, aggressive behavior of inmates" after "less restrictive measures and techniques have proven to be less effective."[58]   Here, Talley told O'Neal and Ladonne he was suicidal and twice tried to commit suicide by fire before he was placed in restraints.[59]   He was initially on one-on-one suicide watch and later given opportunities to speak with mental health professionals Ladonne and Doyle, but he

---

[53] *Id.* Ex. 2 at 10, 12.

[54] *Id.* Ex. 2 at 12.

[55] *Id.* Ex. 2 at 12.

[56] *Id.* Ex. 3 at 3.

[57] *Id.* Ex. 5 at 2 (ECF No. 42-7).

[58] *Id.*

[59] Compl. ¶¶ 8, 10; Defs.' Mot. for Summ. J. Ex. 2 at 2, 5.

continued to claim he was suicidal.[60]  After he was placed in restraints, Karudi evaluated him and concluded that he "appear[ed] to harbor suicidal thoughts – risk for self harm."[61]  Talley again told Ladonne he was suicidal.[62]  Talley also tried to hang himself with his restraints after initially freeing himself from them.[63]  Under these circumstances, the defendants' use of restraints on Talley neither violated DOC policy nor constituted retaliation for Talley's having filed lawsuits against the DOC.

Talley has presented no evidence to contradict or dispute the evidence produced by the defendants.  He has produced no evidence that the restraints were applied in retaliation for filing lawsuits against the DOC.  On the contrary, the undisputed facts demonstrate that the defendants took action to protect Talley from threatened self-injurious behavior.

## Conclusion

Because the undisputed facts demonstrate that the defendants did not place Talley in restraints in retaliation for his filing lawsuits, they are entitled to judgment as a matter of law.  Thus, we shall grant their motion for summary judgment.

---

[60] Compl. ¶¶ 10-11; Defs.' Mot. for Summ. J. Ex. 2 at 2-6.

[61] Defs.' Mot. for Summ. J. Ex. 2 at 8.

[62] *Id.* Ex. 2 at 10, 12.

[63] *Id.* Ex. 2 at 12.